**COMMONWEALTH of Pennsylvania**

**v.**

**Gary L. KRETCHMAR, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 12, 2009.

Filed April 8, 2009.

Reargument Denied June 9, 2009.

Gary L. Kretchmar, appellant, Pro Se.

---

**10.** These rulings appear to work against the modern trend in other jurisdictions. *See, e.g., Webb v. Navistar Int'l Transp. Corp.*, 166 Vt. 119, 692 A.2d 343, 348 (1996) ("Most courts reject the framework that places the burden of loss on one party where two parties contributed to causing the injury."); Am L. Prod Liab. 3d § 40:37 (2008) ("Most jurisdictions that have adopted the doctrine of comparative negligence or fault apply comparative fault principles to strict liability actions.").

Karen A. Diaz, Assistant Distict Attorney, Doylestown, for Commonwealth, appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS and KELLY, JJ.

OPINION BY FORD ELLIOTT, P.J.:

¶ 1 This is an appeal from an order dismissing without a hearing a petition filed under the Post–Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541–9546, by appellant, Gary L. Kretchmar. We affirm.

¶ 2 On October 6, 1981, at approximately 2:00 p.m., Scott Rosenblum was found dead in his apartment in Bensalem Township, Bucks County, Pennsylvania. The victim suffered three gunshot wounds. Ballistics tests revealed that a .22 caliber firearm was used to inflict the wounds. Despite a contemporaneous investigation, which included the questioning of appellant, the crime was regarded as "unsolved" for many years. However, in January 1987, after a grand jury returned a presentment against appellant, a criminal complaint was filed charging appellant with criminal homicide. Aware of the action taken against him with respect to the homicide, appellant subsequently fled Pennsylvania and was ultimately arrested in San Diego, California, in July 1988, on an unrelated matter. Appellant was subsequently extradited to Pennsylvania and ultimately stood trial on, *inter alia*, charges of criminal homicide.

¶ 3 Appellant was convicted in a jury trial of first-degree murder on November 22, 1988, and after a penalty phase hearing was held, a sentence of life imprisonment was imposed. Following sentencing, appellant filed a post-sentence motion, which was denied on May 25, 1989. Appellant filed a direct appeal to this court, which resulted in the affirmance of his judgment of sentence on May 8, 1990. *Common-*

*wealth v. Kretchmar*, 402 Pa.Super. 656, 578 A.2d 38 (1990). Appellant subsequently filed a petition for allowance of appeal with the Pennsylvania Supreme Court, but that petition was denied on April 30, 1991.

¶ 4 On or about April 13, 1992, appellant filed a motion for post-conviction collateral relief. Appellant's petition was denied on September 15, 1994 and was affirmed on appeal to this court on December 29, 1995. A petition for allowance of appeal to the Pennsylvania Supreme Court was granted, *Commonwealth v. Kretchmar*, 545 Pa. 41, 679 A.2d 774 (1996); however, it was later concluded that allowance of appeal had been improvidently granted. *Commonwealth v. Kretchmar*, 547 Pa. 358, 690 A.2d 234 (1997).

¶ 5 Subsequently, appellant filed two additional petitions under the PCRA, one in 2002 and the other in 2006. Both petitions were denied by the PCRA court and affirmed on appeal. The present petition, appellant's fourth, in which appellant tenders a claim under the "unknown facts" exception to the PCRA,[1] was filed on November 29, 2007. This petition was dismissed as untimely on September 15, 2008. The present appeal followed.

¶ 6 Appellant raises four issues. However, all four essentially raise the same matter in slight variation. Issue "C" is most descriptive of appellant's contention on appeal:

C. Was appellant denied a fair and impartial trial as required by the 14th Amendment Due Process Clause when Commonwealth witness, FBI Special Agent John Riley, provided misleading or unreliable bullet lead analysis testimony on November 21, 1988?

Appellant's brief at 2.

¶ 7 Preliminarily, we note that "[o]ur standard of review for an order

---

1. 42 Pa.C.S.A. § 9545(b)(1)(ii).

denying post-conviction relief is limited to whether the [PCRA] court's determination is supported by evidence of record and whether it is free of legal error." *Commonwealth v. Jermyn*, 551 Pa. 96, 110, 709 A.2d 849, 856 (1998). Appellant's fourth PCRA petition is governed by 42 Pa.C.S.A. § 9545(b), which provides as follows:

**(b) Time for filing petition.—**

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

(i) The failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) **the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence;** or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days from the date the claim could have been presented.

42 Pa.C.S.A. § 9545(b) (emphasis added). Since the current PCRA petition was not filed within one year of the time that judgment of sentence became final, it will be untimely unless we find that one of the exceptions of § 9545(b)(1) applies. *Commonwealth v. Murray*, 562 Pa. 1, 753 A.2d 201 (2000).

¶ 8 Appellant's appeal centers upon the usage at his trial of a forensic technique known as Comparative Bullet Lead Analysis ("CBLA").[2] The CBLA process derived from the nature of bullet manufacturing. Generally speaking, in making bullets, ammunition producers melt down a large quantity of lead and then form "wires" with the molten lead. The lead wires are then used to mold the individual bullets, which represent the cap to an individual cartridge or "round" of ammunition.

¶ 9 In making a kettle of molten lead, manufacturers use a combination of scrap or recycled lead from secondary lead smelters along with virgin lead, and add in other elements, as necessary. In studying the composition of various samples of lead, researchers found that molten lead was mostly homogenous in its elemental composition. That is, once melted and blended, the lead contained almost the same exact composition throughout the volume. The relevant elements in bullet lead are antimony, arsenic, copper, bismuth, silver, tin, and cadmium. Since the source of lead varied from production run to production run, each kettle (with a capacity of up to 100 tons) of molten lead would possess compositional elements relatively similar to one another, yet also specifically distinct. In fact, the theory behind CBLA held that no two kettles of molten lead would possess the exact same elemental composition. Thus, by comparing the concentrations of these elements in lead samples, an analyst may be able to determine whether the test lead contained the same composition as the known sample. If a match was present, it had been contended

**2.** CBLA is also referred to in some scientific literature as Compositional Analysis of Bullet Lead ("CABL").

this would show that a test bullet, *e.g.*, one recovered from a crime scene or victim, came from the same batch of bullets as a known sample, *e.g.*, a box of bullets found in the possession of a suspect.[3] CBLA has been conducted since the 1960s, and CBLA testimony has been received in courts across America for nearly the same time.

¶ 10 CBLA evidence was presented at appellant's trial in an effort to link him to the crime. Significantly, the case presented against appellant was primarily circumstantial. Among other evidentiary factors,[4] the body had been discovered by appellant and another man; appellant lived next door to Mr. Rosenblum; and Mr. Rosenblum had previously given appellant a key to his apartment. There was no evidence of forced entry into Mr. Rosenblum's apartment, and the apartment door was double-locked when the body was found. Moreover, the police never found the murder weapon. However, a partially empty box of .22 caliber shells was found in Mr. Rosenblum's apartment, and the shells were of the same type as those recovered from the victim's body. It was also established that Mr. Rosenblum had owned a .22 caliber bolt-action rifle mounted with a scope. Mark Driadon, a friend of appellant's, testified that appellant gave him a .22 caliber rifle with a scope and two boxes of shells for the purpose of finding a buyer sometime between September and November of 1981.[5] Appellant told Driadon that he purchased the gun at a sporting goods shop. Ten days later, with the

gun remaining unsold, appellant asked for and was given the gun back.

¶ 11 As the murder weapon was not recovered, the Commonwealth attempted to link appellant to the putative murder weapon, Mr. Rosenblum's rifle, through CBLA evidence showing that the bullets recovered from Mr. Rosenblum's body "matched" those in the box of ammunition discovered in Mr. Rosenblum's apartment. In part, FBI Agent John Riley testified that the bullets extracted from Mr. Rosenblum's body matched in elemental composition those found in the half-empty box discovered in Mr. Rosenblum's apartment creating a high likelihood that they came from the same manufacturing run. Undoubtedly, the further inference sought by the Commonwealth was that, as appellant subsequently attempted to rid himself of a rifle matching the description of the one previously possessed by Mr. Rosenblum, and as appellant had access to Mr. Rosenblum's apartment, appellant was the perpetrator of the homicide.

¶ 12 Appellant's actual PCRA claim has its genesis in a study entitled "Forensic Analysis, Weighing Bullet Lead Evidence," published by the National Research Council of the National Academies ("NAS") in 2004.[6] The study assessed the reliability of the science of CBLA and its usefulness as a forensic evidentiary tool and did raise questions as to the usefulness of CBLA evidence. At about the same time, a former chief metallurgist for the FBI, William Tobin, offered public criticism of CBLA. Not surprisingly, CBLA soon came

---

3. A more thorough explanation of CBLA can be found here: (Bullet Lead Analysis: World of Forensic Science.) *http://www.enotes.com/forensic-science/bullet-leadanalysis*

4. We mention here only the factors most relevant to the present case. The Memorandum Opinion disposing of appellant's direct appeal provides a thorough recounting of the evidence introduced at trial.

5. As the trial took place several years after the events in question, Mr. Driadon could not be more precise on the date he received the rifle from appellant.

6. The full study is published and available on the internet and can be found at the following link: *http://books.nap.edu/openbook.php?record id=10924 & page=120.*

under attack in a post-conviction context in the case of *Commonwealth v. Fisher*, 582 Pa. 276, 870 A.2d 864 (2005).

¶ 13 In *Fisher*, the appellant was on trial for the murder of Linda Rowden, who he was accused of shooting while she was driving a car that he and another man were also occupying. After the shooting, Fisher reportedly sought brief refuge at the apartment of Denise Walker, where he changed clothes and left behind an opened box of Remington–Peters ammunition. At trial, FBI Agent John Riley: [7]

> testified that he conducted comparative bullet lead analysis (CBLA) of eight bullets from the open box of bullets found at Ms. Walker's apartment with the bullet fragments recovered from the victim's body. He concluded that six of the eight bullets found at Ms. Walker's apartment were analytically indistinguishable from the bullets retrieved from Ms. Rowden's body, while the remaining two of the eight tested had minor compositional differences. Agent Riley opined that bullets that are analytically indistinguishable or of close compositional association typically come from the same box of ammunition. He qualified his finding by saying that these bullets could have also come from another box of ammunition, but that box, most likely[,] would have had to be manufactured by Remington Peters and packaged on or about the same date as the box recovered by police in this case.

*Id.* at 281, 870 A.2d at 867 n. 3. Fisher's trial ended with his conviction for first-degree murder. Some time later, Fisher filed a PCRA petition, which alleged newly discovered evidence in the form of the NAS report and an affidavit of Mr. Tobin relating to CBLA evidence. Appellant also contended that Agent Riley's CBLA

testimony was critical to his conviction, and the new study refutes the underlying theory that bullets from the same batch of lead share a common "chemical fingerprint." *Id.* at 283, 870 A.2d at 868.

¶ 14 The PCRA court agreed with Fisher that the NAS report provided a basis to avoid the jurisdictional time limits under 42 Pa.C.S.A. § 9545(b)(1)(ii), the PCRA's unknown facts exception, but found that the substance within the report did not provide a basis for the grant of a new trial as the new evidence would not have led to a different outcome to Fisher's trial. On appeal to the Pennsylvania Supreme Court, the court disagreed that a claim of potential merit had been presented. The court reasoned:

> Contrary to Appellant's assertions, the National Academies Press article calls the technique the FBI uses for chemical analysis in CBLA cases accurate and reliable. Specifically, the article states that the FBI technique is the best currently available technology for analyzing bullet fragments, while making suggestions for even more precise results. . . .
>
> This language hardly supports Appellant's claim that the NAS study establishes that the methods utilized by the FBI in CBLA cases were 'imprecise and flawed.' Thus, although we agree with the PCRA court to the extent that this information only became available to Petitioner in November of 2003 when it was reported, it does not provide a basis upon which he can predicate an untimely claim because the study does not support Appellant's contention that the methods utilized by Agent Riley (and the FBI in general) were so imprecise and flawed as to render Agent Riley's expert opinion unreliable.

---

7. It would appear that the FBI agent that testified in *Fisher* is the same agent that offered testimony in appellant's case.

*Id.* 582 Pa. at 287–288, 870 A.2d at 870–871. The court further disagreed, in part, that the one-year time bar had been satisfactorily circumvented:

> Likewise, we find fault with Appellant's use of Mr. Tobin's affidavit as a basis for overcoming the jurisdictional time requirements of the PCRA. Although Mr. Tobin offered his affidavit on January 13, 2004, and it facially appears to provide new information, Mr. Tobin states therein that he began his research into whether there was any meaningful or comprehensive scientific research or studies that could validate the premises supporting CBLA in March of 1998. .... Mr. Tobin has authored articles concerning his position regarding of CBLA since 2002. Therefore, Mr. Tobin's views as set forth in his January 2004 affidavit do not meet the newly discovered evidence exception to the timeliness requirements of the PCRA as the information they contain has been available and discoverable for more than two years.

*Id.*

¶ 15 A couple of years later, CBS News, through their weekly news magazine show "60 Minutes," broadcast a feature on the FBI's usage of CBLA evidence entitled "Evidence of Injustice," and contended that it was suspect as a forensic evidentiary tool. Indeed, the CBS spot suggested it was "junk science."[8] The 60 Minutes piece relied heavily upon the assertions of Mr. Tobin, who was highly critical of CBLA evidence. The Washington Post further reported on CBLA evidence and questioned the evidentiary value of the forensic tool.[9] It appears that sometime after the NAS issued its report, the FBI discontinued CBLA. Nevertheless, the above two reports spurred the FBI to issue a press release dated November 17, 2007, wherein John Miller, FBI Assistant Director for Public Affairs, is quoted as saying:

> Recently, joint reporting by the Washington Post and CBS News brought to our attention concerns that our messages on the discontinuation of bullet lead analysis were not clear enough and getting to the right people.... Press Release: FBI Laboratory to Increase Outreach in Bullet Lead Cases, 11/17/07.[10]

¶ 16 In apparent recognition of the potential pitfall of citing to the NAS study as a basis for an unknown facts claim under the PCRA, appellant instead points to the FBI press release and the CBS 60 Minutes piece as the precursor to his claim for post-conviction relief. Appellant asserts:

> What distinguishes appellant's claim from *Fisher* is that appellant does not predicate his claim on an advance report of the findings in the 2004 National Academy of Sciences study ..., or on an affidavit by a retired FBI agent [, William Tobin,] who challenged the validity of the entire CBLA process. In the case at bar, appellant has predicated his substantive PCRA claim entirely upon the internal findings of the FBI that its personnel 'had made mistakes in handling bullet lead testimony and should have done more to alert defendants and the courts.' ... The record is clear that

---

**8.** The 60 Minutes segment and story at issue here can be found now at the CBS website: http://www.cbsnews.com/stories/2007/11/16/ 60minutes/main3512453.shtml

**9.** *http://www.washington post.com/wpdyn/content/graphic/2007/11/17/GR2007111700122. html.*

**10.** Appellant has not actually attached the press release he references. It appears the release in question is the one at the following link: *http://www.fbi.gov/pressrel/pressrel07/ bulletlead111707.htm.* We note that the press release does not state that the FBI had made mistakes in handling bullet lead testimony.

this 'fact' was 'unknown' to the general public, and appellant, until the November 18, 2007, CBS News–60 Minutes/Washington Post report.

Appellant's brief at 14. Unfortunately for appellant, the PCRA court was unconvinced by appellant's attempt to distinguish *Fisher* and found his petition untimely.

¶ 17 Appellant, who is proceeding *pro se,* has certainly recognized the desirability of distinguishing, upon its facts, a facially unfavorable decision such as *Fisher.* However, although appellant makes an argument which would seem to separate *Fisher* from the facts here, we cannot conclude that appellant is entitled to PCRA relief. In arguing that *Fisher* is not controlling as to the timeliness of his petition because his claim is not based upon the NAS report, it would seem that appellant shifts the focus from the notion that CBLA is inherently faulty or untrustworthy to the idea that FBI agents had provided misleading testimony by overstating the significance of the CBLA results. Although this is indeed a different tack than that taken in *Fisher,* this exact point is the primary focus of the attacks upon CBLA evidence leveled by the NAS report.

¶ 18 As the supreme court noted in *Fisher,* the NAS study concluded that the methodology used by the FBI "is accurate and reliable." *Fisher,* 582 Pa. at 287, 870 A.2d at 870. However, it is clear that the NAS offered a less than full endorsement of expert testimony derived from CBLA. Indeed, the difficulty with CBLA evidence is the testimonial representations made at trial by FBI experts. CBLA can certainly distinguish bullet composition effectively, but there is legitimate question as to what this actually proves. According to the NAS, while establishing that two or more bullets may derive from the same compositionally indistinguishable volume of lead ("CIVL") is possible, "every step

from smelting the lead to buying the ammunition in a store provides opportunities for bullets with different compositions to be mixed and for bullets with the same composition to be shipped separately to different outlets in a region or to different regions." (Report in Brief: Forensic Analysis: Weighing Bullet Lead Evidence, The National Academies, at 3.) The NAS report states that the FBI has found that one box of bullets may "contain as many as 14 distinct compositional groups." *Id.* Because of the above, in its report the NAS recommended that "expert witnesses who testify about [CBLA] data should take great care not to overstate the significance of a [CBLA] match, and to make clear the limits on the conclusions that [CBLA] results can support." *Id.* Among the admonishments in the NAS report was to avoid overbroad statements. Specifically, "[w]itnesses should **not** say that two analytically indistinguishable bullets came from the same: melt, production run, or box, or were made on or about the same day. None of these assertions, the report found, can be justified by the data." *Id.*

¶ 19 As the above excerpts attest, the limitations upon supportable expert testimony were a large part of the NAS report-much more than the reliability of the science-and according to the supreme court in *Fisher,* Mr. Tobin had been critical of the value of CBLA testimony in published articles as early as 2002. Also of note, in the wake of the release of the NAS study, the National Association of Criminal Defense Lawyers ("NACDL") issued a statement on February 10, 2004 which stated in part:

Until recently, FBI examiners misleadingly expressed high confidence or even certainty that crime scene lead fragments did or did not come from the 'same box' of other ammunition in evidence. In cases, where a so-called

'match' was identified, the results have at times been devastating to the truth-seeking process, . . .

Nat. Assoc. of Crim. Defense Lawyers, Statement of Barry C. Schenk, Co–Dir., 2/10/04.[11] Thus, it is clear that the message relating to the unreliability of CBLA testimony had been conveyed well before 60 Minutes aired its story and the FBI issued its press release.

¶ 20 Conversely, the FBI's concession that its personnel "had made mistakes in handling bullet lead testimony and should have done more to alert defendants and the courts" does not really put a defendant convicted in part upon CBLA evidence on any additional notice that there were difficulties regarding CBLA expert testimony than did the original NAS report or the press release from the NACDL. Thus, as in *Fisher*, the attempts to circumvent the one-year limitation period is highly problematic because what appellant contends was not known until November 17, 2007, was, in the very least, quite inferable from the original NAS report published in 2004 and certainly from the NACDL press release. While it is not always an easy endeavor to discern when a prisoner could have become aware of "unknown facts" with the exercise of due diligence, here it is safe to say that the materials from which one could level an attack upon the FBI's CBLA testimony was in existence well before 60 days from the date of appellant's petition. As such, we are inclined to agree with the PCRA court's finding of untimeliness.

■ ¶ 21 Nevertheless, and assuming for a moment that appellant's petition is timely, a review of the record reveals that the CBLA testimony offered in appellant's trial was not misrepresentative. As such, appellant's petition was properly dismissed

in either event. In his petition, appellant makes the following averment:

35. Agent Riley testified about a partial box of ammunition marked C–3 and bullets marked C–9, C–10, C–11, 'But as far as C–11 and C–9, in nineteen out of twenty bullets that I examined from this box, I can with great confidence say they most likely came from this box or another box manufactured at the same place on or about the same date.' N.T. 11/21/88, pp. 25, lines 3–8.

Appellant's PCRA petition, ¶ 33–36, notes of testimony, trial, 11/21/88, at 25. While this testimonial excerpt seems to incorporate representations that the NAS report concluded were improper, the whole of Agent Riley's testimony was fair and balanced. For instance, the following exchanges took place during the direct examination of Agent Riley:

Q. When you speak of composition of bullets and when you do neutron activation analysis, is it a fair statement to say that the elemental composition is much like the fingerprint of that piece of ammunition?

A. Well, no. I don't like to compare it as a fingerprint. What this examination means is that these bullets **could have come** from this box of ammunition. If they didn't come from this box of ammunition they **could have come** from another box of ammunition that was most likely manufactured at the same place on or about the same date. And that's because when somebody manufactures ammunition they're not just going to produce one box that has this composition, they're going to manufacture many boxes that will be matching in composition.

11.  *http://www.truthinjustice.org/NACDL-*  *reopen.htm.*

Notes of testimony, trial, 11/21/88 at 24 (emphasis added). Moreover, the following exchanges took place during cross-examination, after Agent Riley explained the bullet manufacturing process:

Q. Could you estimate how many .22 long rifle cartridges you're going to get out of that cauldron?

A. That's a tough one. But we're talking several hundred thousand bullets, at least.

Q. Several hundred thousand?

A. They are not all the same, we know that. There could be several thousand in there that are the same.

Q. That's because in this big stew pot that you have, the elements are distributed in the cauldron in different percentages; correct?

A. That's right. They'll vary, very slightly. And, of course, we can detect these slight differences. But like I said before, it's possible to get fifty, a hundred, thousand bullets of the same composition. . . .

Q. Agent Riley, wouldn't the way the ammunition is distributed or marketed, wouldn't that affect your conclusion about whether they came from the same box or similar box?

. . . .

A. Well, of course, I have no knowledge of how a specific run out of the factory was distributed, but of course the more boxes of ammunition out of one run that are distributed in certain areas, the greater the probability that you could buy a box of these bullets with this composition.

Id. at 27–28.

¶ 22 The whole of Agent Riley's testimony conveys the limited evidentiary value of the CBLA analysis. Agent Riley admitted that there could be a hundred thousand bullets with the same composition as the ones in question here. This certainly conveys the possibility of a random match. Agent Riley stressed that his analysis revealed that the bullet fragments found in Mr. Rosenblum's body "could have come" from the same box of ammunition found at Mr. Rosenblum's residence. In plain language, this choice of words clearly conveys a probability far less than certainty. In contrast, the CBS 60 Minutes spot, using the example of a defendant convicted of murder, Lee Wayne Hunt, demonstrates some of the overreaching CBLA testimony which is at the heart of the controversy:

For years, the FBI believed that lead in bullets had unique chemical signatures, and that by breaking them down and analyzing them, it was possible to match bullets, not only to a single batch of ammunition coming out of a factory, but to a single box of bullets. And that is what the FBI did in the case of Lee Wayne Hunt, tying a bullet fragment found where the murders took place to a box of bullets the prosecutors linked to Hunt.

http://www.cbsnews.com/stories/2007/11/16/60minutes/main3512453.shtml.

¶ 23 In the present case, Agent Riley did not testify that his findings proved conclusively that the bullet fragments were from the same box of ammunition and certainly left open the possibility of random matches. Thus, Agent Riley did not engage in the form of unfounded representation that was at the heart of the NAS study/report or the 60 Minutes and Washington Post pieces, and also at the heart of the press release appellant refers to in his current PCRA petition.

¶ 24 In short, whether regarded as timely or not, we conclude that appellant fails to raise a claim under the PCRA that would entitle him to relief. Moreover, as all of appellant's issues pertain directly or indirectly to the same matter of the CBLA

testimony, we will not specifically address the individual issues.

¶ 25 Order affirmed.