# IN THE COURT OF APPEALS OF IOWA

No. 20-0856
Filed January 12, 2022

**ROBERT GERALD HOOSE,**
      Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
      Respondent-Appellee.
_____

      Appeal from the Iowa District Court for Mills County, Craig M. Dreismeier,

Judge.

      Robert Hoose appeals the denial of his application for postconviction relief.

**AFFIRMED.**

      Marti S. Sleister of Sleister Law, Fremont, Nebraska, for appellant.

      Thomas J. Miller, Attorney General, and Israel Kodiaga, Assistant Attorney

General, for appellee State.

      Considered by Bower, C.J., and Greer and Badding, JJ.

**BOWER, Chief Judge.**

Robert Hoose appeals the denial of his application for postconviction relief (PCR). Hoose failed to prove counsel were ineffective, and the district court did not abuse its discretion in concluding the claim of newly discovered evidence did not warrant a new trial. We affirm.

**I. Background Facts and Proceedings.**

On direct appeal, we set out these facts:

> Hoose is the father of D.H., born in October 1996. On May 4, 2010, Hoose and his wife, Crystal, were out with friends while D.H., her sister [De.H.], and her two half-siblings were at the family home. After Hoose and Crystal got home, Crystal went to the bathroom to shower, and Hoose went to D.H.'s room. According to D.H., Hoose came into her room and ordered her to take her clothes off. He placed her on her hands and knees, pulled down his shorts, and got behind her. At that time, Crystal walked into the room and screamed at Hoose, asking him what he was doing. D.H. ran to the basement. After some time, Crystal and D.H. left the house to talk. D.H. told Crystal that Hoose had been sexually abusing her for the previous five years.
> The next day, D.H. reported the sexual abuse to the police. D.H. was interviewed at Project Harmony, a child protection center, on May 11, 2010. During the interview, D.H. provided detailed statements alleging Hoose had sexually abused her for the previous five years. The allegations included oral, vaginal, and anal sex.

*State v. Hoose*, No. 13-0828, 2014 WL 4930447, at *1 (Iowa Ct. App. Oct. 1, 2014).

In April 2013, a jury convicted Hoose of three counts of second-degree sexual abuse and one count of third-degree sexual abuse. *Id.* at *3. We affirmed his convictions on appeal and preserved for PCR his claims of ineffective assistance of counsel. *Id.* at *9. The supreme court denied further review.

Hoose's PCR application alleges his trial counsel—Eric Nelson, Joe Reedy, and Jennifer Solberg—were ineffective for failing to present testimony of J.P. and failing to raise foundation objections to testimony by the State's expert witness, Dr.

Anna Salter. Hoose also asserts newly discovered evidence entitled him to a new trial.

At the PCR trial, J.P. testified she was best friends with De.H. and that she was about fifteen or sixteen years old at the time of Hoose's jury trial. J.P. stated that before Hoose's jury trial, she was alone with D.H. and D.H. suddenly told her that she missed her dad and wanted to see him. J.P. asked D.H., "Well, if all these allegations are true, why would you want to see somebody that did that?"; D.H. responded, "Well, it really didn't happen. The voices in my head told me to do it." J.P. stated about one week later she told De.H. about the conversation and it should be shared with Hoose. J.P. and De.H. met with Hoose about one month later and informed him of the conversation with D.H. Hoose said he needed to tell his attorneys. J.P. stated the issue was not brought up again in the following several months. J.P. was present for most of Hoose's jury trial and supported De.H. and Hoose. She remembered meeting Hoose's attorneys during the trial but stated they never talked to her about her conversation with D.H. Nor did she raise it with the attorneys.

J.P. remembered meeting with a man after the trial and sentencing and signing an affidavit.[1] Her June 17, 2013 affidavit provides:

> In approximately October of 2012 I was with [De.H.] and [D.H.] at their mother's house . . . . [De.H.] left the room briefly and [D.H.] told me that she wished she had never made the allegations of sexual abuse against Robert Hoose. [D.H.] went on to say that all of the allegations that she made were a lie. When I asked [her] why she made these allegations she told me that the voices in her head told her to do it. I told [De.H.] what [D.H.] told me approximately one

---

[1] She did not remember who the person was, though it was likely the investigator used by defense counsel.

week later. Approximately a month later I told Robert Hoose what [D.H.] had told me.

Hoose testified that when he learned of J.P.'s conversation with D.H. he called attorney Nelson and left a voicemail. Hoose stated, "Nothing really ever came of it. . . . . I don't think they considered her a reliable witness due to her age or something along those lines." He did not ask that J.P. be called as a witness; "I kind of figured my attorneys knew what was best for proceeding with trial." On cross-examination, the following exchange occurred:

> A. I believe [Nelson] either called me later that day or the next day, and I told him. And I told him that I told them to get in touch with him and if he wanted to get in touch with her, he could get ahold of my daughter, [De.H.]. I gave him her phone number, and that was the end of the conversation.
> Q. What specifically did you tell Mr. Nelson when you got him on the phone? A. I specifically told him that [D.H.] recanted to somebody, I believe.
> Q. You said recanted? Were those your words? A. I believe that's probably the words I used.

Reedy testified he was not aware of J.P.'s claim of D.H.'s recantation until one day before the PCR hearing. Reedy remembered seeing J.P. at the trial. J.P. talked to the defense team and told them of her affinity for the Hoose family, but she never brought up D.H.'s purported recantation. Reedy also stated De.H. did not mention such a conversation to the defense team. Reedy testified he would have "absolutely" called J.P. to testify had he been aware of her allegation.

When questioned about why no foundation objections were made to Dr. Salter's testimony, Reedy stated:

> [S]he came in and testified concerning late disclosure, who you disclose to, those types of things, which without proper foundation may be objectionable; but we were aware that Dr. Salter could have given the necessary foundation, so we did not in any effect try to bolster her testimony by asking any foundational questions. Same

thing as we did not ask her about her expertise because we knew she had it. So we did not try to make her out better than she was. We just let her testify to those things.

. . . .

Q. All right. She was an expert on sexual abuse and, from you're what you're telling me, Mr. Reedy, you agree that she was an expert on the topic? A. I believe her credentials were exemplary.

. . . .

Q. According to the [Iowa] Supreme Court, . . . in *Neiderbach*[2] an expert testified about statements made by a nanny in a shaken baby case and testified about a study. Supreme court said there was no evidence that the facts and data that the experts testified about were of a type reasonably relied upon by experts in her field. It seems to me that you have admitted that you did not push the State or the court to have her establish if her comments about studies and reports and data and books were facts and data that experts reasonably rely upon. You did not establish that; is that correct? A. I believe that the prosecution could have established it. I believe Dr. Salter had that expertise. It was just lacking in foundation. I did not ask for further foundation.

. . . .

A. It was my strategy at that point in time to not take an offensive position with Dr. Salter because I knew I would get out the statement concerning a large amount of false accusations. That's what I was after.

Nelson testified he had numerous discussions with Hoose before trial. Nelson did not remember discussing J.P. as a possible witness. Nelson testified that if he had talked with Hoose regarding J.P.'s claims, he would have dispatched his investigator to interview her. He stated had he been aware of J.P.'s testimony alleging D.H.'s supposed recantation, he would have called her to impeach D.H.'s testimony if he were able to lay proper foundation to admit the hearsay.

Hoose presented two witnesses relating to his claim of newly discovered evidence. Christopher Ashburn is married to Hoose's niece, Traci Ashburn. Christopher testified that some time after Hoose's sentencing D.H. was at his

---

[2] *State v. Neiderbach*, 837 N.W.2d 180 (Iowa 2013).

home. He reported that D.H. admitted "she felt like she should come down here and tell everybody it never happened." He believed D.H. was referring to the abuse allegations and she was saying the allegations were not true.

Traci testified about this same conversation with D.H. Traci stated D.H. "told me that it didn't really happen. She didn't really go into specifications. She said that she wanted our family to be all back together again." Traci responded, "Are you freaking kidding me?" Then D.H. "just stared at me for a minute and said, 'I just want our family to be together again.'" Traci stated she "didn't really know who to go to about it."

D.H. testified and denied making any statements recanting her allegations either before or after the trial. She affirmed she was "sticking by all of [her trial] testimony." She acknowledged the allegations impacted her relationship with family members, stated she has told people she wished she would not have come forward, and wished she had her family back.

The PCR court rejected Hoose's ineffective-of-assistance-of-counsel claim. The court found counsel did not know about J.P.'s conversation with D.H. The court specifically found Hoose's testimony that he did tell counsel prior to trial was not credible. As for the claims of ineffectiveness in handling Dr. Salter's testimony, the court found counsel made reasonable strategic decisions. The court also ruled the later-discovered claims that D.H. recanted her allegations were merely impeaching and did not warrant a new trial. Hoose appeals.

**II. Scope and Standard of Review.**

Generally, we review PCR proceedings for errors of law. *Ledezma v State*, 626 N.W.2d 134, 141 (Iowa 2001). However, we review constitutional claims like ineffective assistance of counsel de novo. *Id.*

"A postconviction action based on newly discovered evidence is reviewed for corrections of errors at law." *More v. State*, 880 N.W.2d 487, 498 (Iowa 2016).

**III. Discussion.**

*A. Ineffective assistance of counsel.* To show trial counsel were constitutionally deficient in their performance, Hoose must prove by a preponderance of the evidence both (1) counsel breached an essential duty and (2) counsel's failure resulted in prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Majors*, 940 N.W.2d 372, 391 (Iowa 2020).

*1. Failure to call J.P. as a witness.* Hoose's claim relating to J.P.'s potential testimony about D.H.'s purported recantation fails on the first prong. Counsel breached no duty because counsel did not know of J.P.'s statement. Hoose asserts he informed counsel before trial of J.P.'s report that D.H. recanted her claims of sexual abuse. The PCR court found this testimony not credible. We give weight to the court's credibility findings. *Ledezma*, 626 N.W.2d at 141. The court's finding is supported by the fact that prior to trial none of the three defense attorneys had any memory of being informed of J.P.'s claim that D.H. recanted. Nelson testified if Hoose informed him of a possible impeachment witness, he would have sent an investigator to a look into it. Someone did meet with J.P.—after sentencing—and J.P. gave that person her affidavit. Additionally, D.H. testified

she did not make the statements to J.P., and she stood by her trial testimony. We find Hoose did not establish a breach of duty.

*2. Expert witness foundation.* As he did on direct appeal, *see Hoose*, 2014 WL 4930447, at *6, Hoose contends counsel was ineffective in failing to challenge Dr. Salter's testimony because "[t]he prosecution did not lay any foundation for the basis that any of the statistics, research, or case studies were relied upon in the field." We found the record inadequate on direct appeal to address the claim, stating "We do not know the reasons counsel may have had for not objecting to the testimony." *Hoose*, 2014 WL 4930447, at *6.

During the PCR trial, Reedy provided his reasons for not challenging the foundation of Dr. Salter's expert testimony. The PCR court found Reedy "knew that Dr. Salter had the credentials to support her testimony" and Reedy "did not want to draw attention to the same in an effort to keep from bolstering her testimony." The court found Reedy's strategic reasons for not challenging the foundation of Dr. Salter's testimony were reasonable. Hoose does not address the reasonableness of Reedy's strategy. *See Majors*, 940 N.W.2d at 391 ("Counsel's performance is measured objectively against the prevailing professional norms after considering all the circumstances. A claimant can rebut the presumption [of competency] by showing that counsel failed to perform an essential duty. More is required than a showing that counsel's trial strategy backfired or the case would have been tried differently by another attorney." (citations omitted)). We agree with the PCR court that Hoose has failed to prove trial counsel were ineffective.

*B. Newly discovered evidence.* To prevail in this PCR action because of newly discovered evidence, Hoose must show:

> (1) that the evidence was discovered after the verdict; (2) that it could not have been discovered earlier in the exercise of due diligence; (3) that the evidence is material to the issues in the case and not merely cumulative or impeaching; and (4) that the evidence probably would have changed the result of the trial.
>
> The standard for whether the evidence probably would have changed the result of the trial is a high one because of the interest in bringing finality to criminal litigation.

*More*, 880 N.W.2d at 499 (citations omitted).

The PCR court determined the testimony of J.P. and the Ashburns was merely impeaching. The court explained:

> D.H. testified at the [PCR] hearing and denied ever recanting or making any sort of statement either before or after the trial of Hoose that the abuse never happened or she was making it up. She acknowledged how these incidents impacted her relationship with family members. She admits she has told people that she wished she would have never come forward with the allegations as she misses her family and wanted her family back. Regardless of those statements, she testified the abuse still occurred as she originally testified.
>
> D.H. was consistent at the time of the [PCR] trial in affirming the events with Hoose occurred. She denied ever recanting to anyone. She admitted to the impacts this had on her family and thinking she should not have come forward with the allegations. As such, this court agrees that this testimony could only be offered for impeachment purposes which fails to meet the threshold for consideration of newly discovered evidence. Assuming it is more than simply impeachment and is a material issue, it is cumulative and would not change the result at the time of trial. As already noted, the defense's theory all along is that D.H. was lying and were attacking her credibility. This court finds that Hoose has failed to meet his burden of proof for newly discovered evidence.

We agree with the PCR court the evidence is merely impeaching and thus Hoose's claim of newly discovered evidence fails.

In any event, Hoose has not met the high standard of showing that the verdict probably would have been different based on J.P.'s and the Ashburns' evidence. *See More*, 880 N.W.2d at 510 ("[T]he inquiry is whether, based upon all

the evidence, the verdict probably would have been different in the case before us.").  As the PCR court noted, defense's theory was D.H. was lying and the defense challenged D.H.'s credibility at trial.

D.H.'s credibility was not the defense's only hurdle at trial.  Defense counsel Solderg noted the defense took a hit with Hoose's own testimony,

> I believe on direct he was asked something about the girls wanting to go live with the mom.  And he said, I absolutely told them they could go live with them, but if they did, I was going to terminate my parental rights.  And I didn't want to bring up custody.  I felt the State would have brought up that comment.  And I didn't think that would have been a helpful strategy for us in closing.

Solberg thought Hoose's testimony that he would terminate his parental rights if the children went to live with their mother was "harsh" and "could be conceived as control and not helpful to our narrative."  In addition, Solberg was asked what she thought was the "worst evidence presented by the State that really nailed the coffin shut for your client's case" and responded:

> For me the hardest part in this case was—you know, they talk about delayed reporting, but the daughter didn't report this until after this incident of Crystal walking into the bedroom, and then that whole scenario of our client being found in a kind of compromising position, holding onto the girl who doesn't have clothes on, and the position, and that then the story comes out.

Considering the record as a whole, it is not likely the result of the trial would probably have been different even if Hoose could introduce the new evidence.  We therefore affirm.

**AFFIRMED.**