# IN THE COURT OF APPEALS OF IOWA

No. 23-0669
Filed June 5, 2024

**JOE ANTHONY LOPEZ,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Robert B. Hanson,

Judge.

An applicant appeals the denial of his postconviction-relief action.

**AFFIRMED.**

Janice B. Binder, Martelle, for appellant.

Brenna Bird, Attorney General, and Linda J. Hines, Assistant Attorney

General, for appellee State.

Considered by Tabor, P.J., and Badding and Buller, JJ.

**TABOR, Presiding Judge.**

Joe Lopez is serving a life sentence for killing his girlfriend's young child. We affirmed his conviction on direct appeal. *See State v. Lopez*, No. 16-1489, 2018 WL 6719728, at *14 (Iowa Ct. App. Dec. 19, 2018). Lopez now contends that new scientific evidence on shaken baby syndrome and abusive head trauma undermines his conviction. He also argues that his criminal trial counsel failed him in two ways: (1) by not challenging prior-bad-acts testimony and (2) by not marshalling scientific data to rebut the State's expert witnesses. The district court rejected Lopez's allegation of newly discovered evidence and the first ineffective-assistance-of-counsel claim. Lopez did not raise the second ineffective-assistance claim in the postconviction relief (PCR) proceedings. So we decline to address it. On the other two claims, we find denial of relief was proper.

## I. Facts and Prior Proceedings

R.A. was the daughter of Lopez's girlfriend, Nisa. Lopez moved into Nisa's basement apartment in the fall of 2014.[1] R.A. was not quite two years old when Lopez claimed that she toppled from her highchair and hit her head in late November. She died in the hospital a few days later. A couple of days before her hospitalization, R.A. was sick and couldn't hold down her Thanksgiving dinner. The next day, Nisa recalled R.A. had been "very quiet" and fell asleep on the couch. Come Saturday, Lopez claimed that R.A. woke up crying around 2:00 a.m. He told detectives that he picked her up and put her in the highchair, where he fed

---

[1] Also living in the apartment were R.A. and Nisa's two sons, ages eight and four.

her leftover turkey.  He then went to the bathroom.  While there, he said he "heard

a big thump" and returned to find R.A. collapsed on the floor.

On direct appeal, we described R.A.'s injuries:

Lopez said he saw a bump on R.A.'s head.  Her eyes were rolled back, and she was gasping for air.  Lopez woke Nisa, telling her they needed to rush R.A. to the hospital.
Nisa recalled when Lopez woke her, R.A. already had her coat and boots on and was not making any sounds, and Lopez looked worried.  Nisa felt a bump on the back of R.A.'s head.  Lopez drove Nisa and R.A. to the hospital. . . .
. . . .
As the on-call trauma surgeon, Dr. Richard Sidwell evaluated R.A. . . .  Dr. Sidwell described the back of her head as "boggy, and that means swollen, squishy."  He further observed:
a skull fracture toward the back of her head . . . hemorrhage around the brain and creating pressure on the brain. . . .
. . . [S]he had at least four rib fractures . . . in addition to a bruise on her head and a scrape on her chin. . . .
After examining R.A., Dr. Sidwell spoke with Lopez and Nisa. Lopez repeated his version of events, but Dr. Sidwell was skeptical. . . .
. . . Dr. [John] Piper also evaluated R.A. in the emergency room.  His primary concern centered on the fact R.A. "was in a very deep coma and was having problems breathing spontaneously." . . .
. . . .
When radiologist Bradley King reported for his shift the morning of November 29, he found the overnight radiologist had already performed scans of R.A.'s head and cervical spine.  When reviewing those images, Dr. King noted additional posterior medial rib fractures. . . .
. . . .
Pediatrician Kenneth McCann examined R.A. in the afternoon on November 29.  Dr. McCann, a child abuse specialist, also reviewed R.A.'s chart and spoke with Nisa.  After his consultation, Dr. McCann concluded R.A.'s injuries were inconsistent with falling from a high chair.

*Id.* at *2–3.

The doctors managed to keep R.A. stable over the next few days but could

not reduce her brain swelling.  Even the drastic measure of a decompressive

craniotomy—removing a piece of the child's skull to give her brain more room to swell—did not work. R.A. died four days after coming to the hospital.

The State charged Lopez with first-degree murder and child endangerment resulting in death in 2015. At his May 2016 trial, the State called six expert witnesses. Among those, Dr. King testified that R.A.'s rib fractures occurred within "probably a week or less" of her death. He explained that "posterior medial rib fractures are considered to be a classic sign of child abuse." Dr. McCann also believed that R.A.'s injuries were not accidental, noting that she "had two C-shaped bruises on her abdomen. And we know abdominal bruising is a high red flag for bruising deeper down. So that sort of puts two-and-two together in my head." He did not "feel comfortable" saying that "the ribs had to have happened at the same time as the skull fracture." Dr. Sidwell also rejected the notion that R.A.'s injuries resulted from an accident: "So a fall from the highchair does not explain a severe traumatic brain injury with a skull fracture and the bleeding in her brain and the multiple broken ribs that she has."

Polk County Medical Examiner Gregory Schmunk—who performed R.A.'s autopsy—estimated that her abdominal injury occurred five to seven days before her death. He concluded, "[F]alling from a highchair onto your back—the history was that she was found on her back facing up—would not cause this type of an injury." Dr. Schmunk also said the rib fractures "were due to an abusive act, a physical squeezing of the chest by another person, certainly an adult." He determined the cause of death was "craniocerebral trauma, which is a medical way of saying injury to the brain and the skull." He testified "within a reasonable degree of medical certainty" that R.A.'s death was a "homicide or the act of another person

on her." From the autopsy report, Dr. Piper learned that R.A. suffered axonal tears. He explained that an axonal injury, where the nerves are sheared, "tells us that there have been forces that are different than just a simple fall." He told the jury that such injuries are common in patients "literally that are thrown out of vehicles in an accident." Finally, radiologist Brent Steinberg agreed that R.A.'s "multiplanar" skull fracture was "atypical of just a benign fall."

To rebut the State's medical evidence, the defense called two experts: pediatric neurosurgeon Thomas Carlstrom and forensic pathologist Bradley Randall. In Dr. Carlstrom's opinion, R.A.'s injuries were consistent with a fall from a highchair. Likewise, Dr. Randall testified that R.A.'s skull fracture could have resulted from a short fall.

After hearing expert evidence from both sides, the jury returned a guilty verdict. The court sentenced Lopez to life imprisonment. After we affirmed his conviction on direct appeal, Lopez applied for PCR in May 2020. The district court denied relief in April 2023. Lopez appeals.

## II. Scope and Standards of Review

We review a PCR action based on newly discovered evidence for correction of legal errors. *More v. State*, 880 N.W.2d 487, 498 (Iowa 2016). When, as here, the applicant also raises constitutional claims, we review them de novo. *See Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001). While not binding, we give weight to the district court's factual findings, especially on witness credibility. *Id.*

### III. Analysis

Lopez seeks relief based on newly discovered evidence and two claims of ineffective assistance of trial counsel.[2] We address his arguments in turn.

### A. Newly Discovered Evidence

The PCR chapter allows an applicant to seek relief if "[t]here exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice." Iowa Code § 822.2 (2020). To establish his claim of newly discovered evidence, Lopez must show:

> (1) the evidence was discovered after the verdict; (2) the evidence could not have been discovered earlier in the exercise of due diligence; (3) the evidence is material to the case and not merely cumulative or impeaching; and (4) the evidence probably would have changed the result of the trial.

*Grissom v. State*, 572 N.W.2d 183, 184 (Iowa Ct. App. 1997).

As newly discovered evidence, Lopez points to "evolving science" behind the theories of shaken baby syndrome (SBS) and abusive head trauma (AHT). He contends that he was "convicted based on SBS or AHT, an unproven theory, now discounted in most of the scientific community." For his proposition, Lopez cites several articles from medical journals but relies heavily on a 2018 analysis from the Swedish Agency for Health Technology Assessment: *Traumatic Shaking: The Role of the Triad in Medical Investigations of Suspected Traumatic Shaking,* Göran Elinder et al., 107 Acta Paediatrica 3 (2018).[3] The "triad" refers to "subdural haematoma (bleeding between the dura mater and the brain), retinal

---

[2] Lopez was represented by two attorneys at his criminal trial—F. Montgomery Brown and Thomas H. Miller. Only Brown testified at the PCR hearing.
[3] The court admitted this article as an exhibit in the PCR proceedings.

[hemorrhages] and various forms of brain symptoms (encephalopathy)." The study concluded: "There is limited scientific evidence that the 'triad' of symptoms or its constituent parts may occur due to shaking," but "there are differential diagnoses that can also cause the three symptoms/findings in the triad."

The PCR court acknowledged that this Swedish study came out in 2018, two years after the verdict. But the court questioned its materiality and its likelihood of altering the result of Lopez's trial. *See Whitsel v. State*, 525 N.W.2d 860, 863 (Iowa 1994) (**"**For purposes of [PCR], the newly discovered evidence must be relevant and likely to change the result of the case."). The PCR court figured that had the Swedish article been available at the time of the trial, it would not have helped Lopez. In fact, "it would have served only to highlight the myriad of injuries R.A. suffered beyond the triad injuries." The court elaborated on its reasoning:

> [T]he [article] is wholly irrelevant to [Lopez's] case for several reasons. Primarily, the trial record reflects [Lopez] was charged with murder and child endangerment. To this end, [the State's] medical experts opined the child's injuries were consistent with being slammed and/or forcefully squeezed. [The State] endeavored to prove: premeditated murder; murder by assault while manifesting extreme indifference to human life; and/or child endangerment murder. [Lopez] answered with his own experts and attempted to establish R.A.'s injuries were due to a fall from a highchair.
>
> While the allegation that R.A. had been shaken may have been mentioned briefly in the context of the abuse charges, the Court finds it was not the main contention of [the State] nor was it utilized by the defense. Moreover, R.A. had suffered injuries not included in the triad and not referred to for shaken baby syndrome. These injuries included fractures to the back of the head and significant skull fracture, twelve fractured ribs on the back, and injury to the abdomen and bowel system.

We find no error in the PCR court's analysis.[4]  As the PCR court noted, the fighting issue at trial was whether a fall from the highchair could have caused R.A.'s injuries.  The State's experts expressed doubt that such a short fall could lead to the kind of skull fracture that she suffered.  As evidence of abuse, the State's experts also pointed to R.A.'s posterior medial rib fractures and mesentery bruising.  For the defense, attorney Brown called doctors Carlstrom and Randall to rebut those views.  Undercutting Lopez's PCR claim, the issue at trial was not whether R.A. was "merely shaken."  As attorney Brown testified: "All of the experts, including my own experts and Joe's testimony, was that the child either had fallen or been subject to a slam event."

As an alternative argument, Lopez contends that even if R.A. did die from abusive head trauma, the State could not rely on the "last in time caretaker" theory to establish his guilt.  He cites *Del Prete v. Thompson* for the proposition that "some courts" have recognized lucid intervals between head injuries and loss of consciousness in children.  10 F. Supp. 3d 907, 956 (N.D. Ill. 2014) (crediting witnesses who testified that an infant victim "can have a lucid interval after being subjected to head trauma").  This argument is unpersuasive because the concerns in *Thompson* do not track the events leading to R.A.'s death.  Lopez acknowledged her head injury occurred while in his care.  The question was whether his explanation of its mechanism was plausible in the views of the medical experts.

---

[4] Attorney Brown testified that he didn't think the Swedish study would have been useful because other scientific literature published around the same time maintained that "the science of abusive head trauma from blunt impact and the findings relative to that is bedrock, good, medical legal science."

We have considered the totality of Lopez's arguments about "new scientific evidence" on shaken baby syndrome and abusive head trauma and find much of the "shift" he notes in the medical community on these theories predate his 2018 criminal trial. *See*, *e.g.*, *State v. Edmunds*, 746 N.W.2d 590, 599 (Wis. Ct. App. 2008) (finding "there are now competing medical opinions as to how [child's] injuries arose and that the new evidence does not completely dispel the old evidence"). But as the district court decided, even more recent studies would not have had a reasonable probability of changing the outcome of his trial, given the extent of R.A.'s injuries and the other evidence presented in his criminal trial.

## B. Ineffective Assistance of Counsel

For Lopez to prevail on his ineffective-assistance-of-counsel claims, he must show that attorney Brown breached an essential duty resulting in prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the first prong, Lopez must prove that Brown performed below the standard demanded of a reasonably competent attorney. *See Ledezma*, 626 N.W.2d at 142. To show prejudice, Lopez must prove that but for Brown's unprofessional errors, there was a reasonable probability of a different outcome. *See id.* at 143. "A reasonable probability is one that is sufficient to undermine confidence in the outcome." *Millam v. State*, 745 N.W.2d 719, 722 (Iowa 2008) (cleaned up).

### 1. Failing to Object to Prior Bad Acts

First, Lopez claims that his attorney was ineffective for allowing prior bad acts testimony from Nisa's landlady.[5] The landlady testified that she didn't know

---

[5] Lopez argued this issue on direct appeal. But we preserved the claim for possible PCR proceedings.

Lopez was living in the apartment below her until she woke to the sound of children crying and Lopez yelling. The landlady told the jury that she heard Lopez shout "shut the fuck up." She said he sounded "upset" and "angry."

Lopez claims that the landlady's testimony was inadmissible under Iowa Rule of Evidence 5.404(b). Under that rule, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Iowa R. Evid. 5.404(b)(1). But such evidence may be admissible for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R. Evid. 5.404(b)(2). Our supreme court has held that "whenever the State offers uncharged misconduct to establish an ultimate inference of mens rea, the court should require the prosecutor to articulate a tenable noncharacter theory of logical relevance." *See State v. Sullivan*, 679 N.W.2d 19, 28 (Iowa 2004) (holding that rule 5.404(b) is a "rule of exclusion"). Lopez contends that Brown should have moved to exclude the landlady's testimony as impermissible propensity or character evidence.

At the PCR hearing, Brown explained that he "did not assess [that evidence] as either propensity or character evidence." He continued: "I didn't assess it as 404(b) in the sense that it was somehow [an] actual prior bad act. And I didn't assess it as more prejudicial than probative even though it had some incriminating characteristics. All incriminating evidence is prejudicial. . . . [I]t just wasn't on [my] radar." The PCR court decided that the landlady's testimony did not fall under the prohibition of rule 5.404(b): "Yelling or arguing, while undesirable, is generally not considered to be a prior crime or wrong." But the court also suggested that Brown

handled the testimony effectively: "On cross examination, trial counsel was able to quickly negate it by demonstrating how common it was for parents to yell at their children." Finally, the court found, even if rule 5.404(b) applied, Lopez's argument failed because the State offered the evidence for the "noncharacter and logically relevant reason of explaining how the landlord knew [Lopez] had been staying in the apartment."

Like the PCR court, we find that Lopez did not prove counsel was ineffective for failing to object to the landlady's testimony. But we take a different analytical approach. In our de novo review, we find that defense counsel performed effectively despite not objecting to the landlady's testimony. Counsel had no duty to make a meritless objection. *See State v. Wills*, 696 N.W.2d 20, 24 (Iowa 2005). Lopez's malice aforethought and intent to kill R.A. were contested issues at trial. *See State v. Taylor*, 689 N.W.2d 116, 125 (Iowa 2004). When an accused has a close relationship with the victim, prior threats and abusive treatment are admissible when offered on relevant issues under rule 5.404(b). *Id.* Similarly, evidence of an "acrimonious relationship" between the defendant and the victim is pertinent to whether the defendant acted with malice. *State v. Newell*, 710 N.W.2d 6, 21 (Iowa 2006). Following this line of reasoning, our court has held that a caregiver's history of vitriol toward a child was relevant to determine his intent and motive for harming the child. *See State v. Little*, No. 19-1062, 2021 WL 1400068, at *7 (Iowa Ct. App. Apr. 14, 2021); *see also State v. Tate*, No. 04-1479, 2006 WL 334185, at *5 (Iowa Ct. App. Feb. 15, 2006) (concluding prior verbal abuse of child "was strong evidence on the issue of defendant's intent"). What the landlady overheard from the basement rental was relevant to rebut Lopez's claim of

accident.  Lopez failed to show that trial counsel breached an essential duty by not objecting to her testimony.

### 2.  Failing to Offer Scientific Evidence to Rebut State's Experts

Lastly, Lopez argues that his counsel was ineffective for failing to marshal scientific data to effectively rebut the State's expert witnesses.  But the State correctly contends that Lopez did not make that argument in the district court.  So the PCR court did not rule on it.  Thus, we cannot consider this claim on appeal. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

**AFFIRMED.**